UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISHNA D. BERNARD,<br>    Plaintiff,<br>    v.<br>CAROLYN W. COLVIN,<br>    Defendant. | Case No. 15-cv-01040-WHO<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 20, 23 |

Plaintiff Krishna Bernard appeals the Commissioner's denial of her application for benefits. The Administrative Law Judge found that Bernard had a severe seizure-like impairment but then failed to account for that conclusion in the determination that Bernard retained the residual functional capacity to perform work. That failure requires remand for further proceedings.

## BACKGROUND

### I. PROCEDUREAL BACKGROUND

Krishna Bernard applied for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act in September 2011. Administrative Record (AR) 13. Her application was denied initially in November 2011 and upon reconsideration in April 2012. *Id*. She appeared before an ALJ for a hearing on July 8, 2013. AR 43. The ALJ issued her decision on September 25, 2013. AR 10. Plaintiff filed this action for judicial review pursuant to 41 U.S.C. § 405(g), and the parties' cross-motions for summary judgment are pending before me.

### II. BERNARD'S IMPAIRMENTS

#### A. Seizures and Mental Health Issues

Bernard has non-epileptic, non-electric seizures, which started in November 2010. AR 43, 444. Bernard suffered from head trauma before the onset of her seizures, and doctors originally

thought that these seizures might be related to these previous head traumas. AR 364, 495. Since their onset in November 2010, plaintiff continued to have seizures through the date of the ALJ hearing. She sought treatment for her seizures in emergency room and clinic visits, as well as from her primary treating physician, Dr. Wendy Kohatsu. AR 427 (January 2011), AR 422 (February 2011), AR 465-469 (June 2012), AR 487 (November 2012), AR 478 (January 2013), AR 525 (April 2013).

In January 2011, Dr. Kohatsu prescribed Dilantin for the seizures. AR 423. Because plaintiff had trouble "tolerating" that medicine in February 2011, Dr. Kohatsu switched plaintiff to Keppra. *Id.*[1] In April 2011, Dr. Kohatsu noted that plaintiff stopped taking Keppra for a week because she has been throwing up, but that she would start again. AR 411. At the ALJ hearing, plaintiff testified that she cut back on the Keppra at that time because she was "throwing them back up." AR 55. In February 2012, Bernard admitted to taking only 1000 mg of her 2500 mg dose because she felt it was not working. AR 387, 392. As of June 2012, Dr. Kohatsu noted that Bernard was compliant with her prescribed Keppra medication and was taking it at therapeutic levels. AR 467.

Because medicines were not controlling the seizures, and because MRI and EEG studies were normal, Dr. Kohatsu referred plaintiff for a comprehensive seizure study at CPMC in late 2012. AR 488, 492, 494. In December 2012, plaintiff underwent the comprehensive seizure study and was diagnosed by Dr. Michael Valan with PTSD and conversion disorder as the etiology behind the seizures. AR 482, 484-485. Epilepsy was ruled out and the seizures were confirmed as "non-electrical." AR 482-484. In light of the diagnoses, Bernard was taken off Keppra, but kept on Prozac to address her mental health issues and referred to Dr. Kozart to determine optimal treatment for her PTSD. AR 482-483.

Her diagnosis for PTSD and conversion disorder were linked to the physical abuse by her two ex-husbands, particularly from her second husband who abused her physically, mentally, and

---

[1] During a visit to an emergency room in February 2011, Dr. Robert K. Landman noted that Bernard "did not do well with the Dilantin, as it made her very groggy and too tired to function." AR 444.

emotionally. AR 64-65, 484-485. Bernard also suffered physical abuse at the hands of her father during her childhood. AR 485. Additionally, Bernard was emotionally traumatized by the loss of custody of her children. AR 64. During her administrative hearing, Bernard acknowledged that her past abuse could trigger her "episodes." AR 64-65; *see also* AR 494 (noting episodes can be triggered by talking about stressful situations). Bernard has also been diagnosed with depression. AR 472-473, 488.

There are different estimates in the record regarding the frequency and duration of Bernard's seizures. Videos taken of Bernard's seizures by Bernard's significant other, Joshua Townsend, and shown to Dr. Kohatsu in June 2011, showed the seizures lasting about 30 and 60 seconds. AR 407. On October 12, 2011, Dr. Kohatsu noted that Bernard claimed to have seizures approximately once a week. AR 384. In a seizure questionnaire dated October 25, 2011, Bernard stated that she has two to three seizures a week and that they lasted two to six minutes, with some lasting up to eight minutes. AR 262. On another seizure questionnaire from March 5, 2012, Bernard stated that she experiences one to two seizures a week, and that they last about four to six minutes. AR 309. In a medical source statement June 20, 2012, Dr. Kohatsu wrote that Bernard suffers from one to three seizures a week, and that after the seizure plaintiff must sleep for approximately three hours and may not regain full comprehension until 24 hours later. AR 465 - 466. At the administrative hearing in July 2013, Bernard stated that she has three to five seizures a week, and that the seizures last three to seven minutes. AR 44-45. Bernard explained that she did not know how long her seizures lasted and that she had to rely on others' observations. AR 45. Joshua Townsend testified that Bernard suffered from three to eight seizures weekly that lasted three to six minutes. AR 345-346.

Bernard experiences auras in the form of a taste in her mouth several minutes before a seizure, as well as ringing in her ears several seconds before a seizure. AR 52. She maintains a seizure journal, but the journal entries are incomplete. AR 46. Bernard explained to the ALJ that her journal is incomplete because often she cannot remember or is not aware that she has experienced a seizure. AR 46-47.

Bernard complained of limited concentration and cognitive function, like grogginess,

following seizures. AR 422, 424, 445. Bernard takes precautions when at home as a result of her seizures, including placing a stool in her shower so that if she experiences one of her two auras – a taste in her mouth or ringing in her ears – she can sit and try to avoid additional injuries as a result of the oncoming seizure. AR 66-67. Bernard fixes simple meals for herself, requires help from her significant other when preparing meals for the family, and requires help when completing household chores and "things like that." AR 60. Bernard continued to drive until 2012, despite the start of her seizures in 2010, because she had trouble relinquishing her independence. AR 47-48. Bernard stated that it can take up to one to two days for her to recover from a seizure and resume daily activities. AR 309. At the administrative hearing, Bernard added that she typically must lie down for three to four hours following a seizure. AR 68. Joshua Townsend similarly stated that Bernard requires "an hour or two of sleep" after a seizure and "once she comes out of that she is not 100 percent" and is "no good for the rest of the day." AR 346-347.

As of the July 2013 administrative hearing, Bernard had not seen a therapist or counselor for her PTSD. AR 57. She explained that although she was placed on a waitlist for therapy a couple of months after her diagnosis in December 2012, she was still on the wait list as of the July 2013 ALJ hearing. *Id*. Bernard testified that she wanted to "start that recovery" "right away" upon being diagnosed, and so she searched for a therapist herself. *Id*. However, the record indicates that psychiatric treatment was available, at least as of April 2013, but Bernard declined. AR 526.

In a June 20, 2012, "Seizures Medical Source Statement," Dr. Kohatsu indicated that plaintiff suffered from 1-3 seizures a week, and that plaintiff needed to sleep/be inactive for three hours following a seizure and might not return to full comprehension for 24 hours following a seizure. AR 465-466. Dr. Kohatsu opined that the timing of the seizures was unpredictable, that Bernard was incapable of handling even a loss stress job, she would have good days and bad days, and would likely miss work more than four times a month due to the seizures. AR 467-468. In a March 7, 2013 Physician's Medical Source Statement, Dr. Kohatsu identified plaintiff's diagnoses as PTSD and convulsions, noting "repetitive seizure-like neurological activity" and a "severe stress response." AR 513. Dr. Kohatsu noted that plaintiff suffered from memory deficits

4

and difficulty with attention and concentration that would frequently interfere with plaintiff's ability to perform simple work tasks in a typical workday (34-66% of time time). AR 514. Dr. Kohatsu also concluded that plaintiff would be absent from work more than four days a month as a result of her impairments. AR 515.

### B. Physical Ailments

Although Bernard's primary complaint is her seizures, she claims to also suffer from difficulties with sleeping and nightmares, numbness in her right leg, swelling of her hands, and chronic back pain. AR 55-56, 58, 67, 69. It is not clear whether Bernard's pain and swelling is related to her seizures, but they started at approximately the same time. AR 59. Dr. Kohatsu noted that Bernard "acknowledge[s] that stress" makes her "back pain worse." AR 477. As a result of pain and swelling in her hands, she has trouble lifting anything heavier than approximately five to ten pounds. AR 61. At least up until the date of the administrative hearing, Bernard had not completed any medical testing for the pain in her back or legs in the past two and a half years. AR 59. Similarly, she had not received treatment, beyond acupuncture and prescription medications, for her back pain or for the swelling or pain in her legs. AR 58. Bernard takes Cyclobenzaprine – muscle relaxers – for her back as well as Percocet. AR 55, 336.

### C. Work History

Prior to the onset of her seizures, Bernard held numerous jobs, but was primarily a stay at home mom. AR 40-43. Her jobs included working as an assistant teacher, working at Blockbuster, working at Red Robin, and working at Staples. AR 41. She held these jobs for short periods of time, because she moved with her first husband (who was a soldier) and she would pick up seasonal work. *Id*. She started teaching preschool, but stopped working in 2008 for reasons unrelated to her seizures or pain. AR 255. She most recently worked for Townsend's landscaping company in January 2011. AR 38, 348. But, according to Townsend "she just could not do it in a way that would keep up with the business. She could do it on her good days but her good days were not coming enough. People were getting the wrong invoices because she had a seizure and still tried to send things out. Things were going in the wrong files and getting confused. People were being billed the wrong amounts." AR 348.

### III. ALJ'S DECISION

At step one, the ALJ found that Bernard did not engage in substantial gainful activity after November 1, 2010, which was the alleged onset date for her disabilities. AR 15. At step two the ALJ found that Bernard had several severe impairments, including: non-epileptic seizure disorder, chronic pain syndrome, depressive disorder, and posttraumatic stress disorder. AR 16. At step three, the ALJ determined that Bernard's impairment or combination of impairments do not meet the severity of one of the listed impairments. AR 16. The ALJ focused, in part, on Bernard's non-adherence to her anti-seizure medications, lab work which demonstrated a sub-therapeutic level of anti-seizure medications, and her doctor's own conclusion that plaintiff did not have epilepsy to determine that she was not disabled by epilepsy. AR 16.

As to her "mental impairments," the ALJ concluded that she has only mild restrictions in her daily living, mild difficulties in social functioning, and mild to moderate difficulties with concentration, persistence, and pace. AR 16-17. To support the conclusion as to daily living, the ALJ cited Bernard's performance of limited housework, grocery shopping, self-care, and child-care. AR 16. For social functioning, the ALJ cited Bernard's good relationship with her significant other and child and pleasant demeanor with examining sources. AR 17. With respect to concentration, persistence or pace, the ALJ supported the "mild to moderate difficulties" finding by citing to plaintiff's normal memory and thought process during her examinations. *Id*. Finally, the ALJ found that "the claimant experienced no episodes of decompensation, which have been of extended duration." *Id*.

At step four, the ALJ determined that Bernard has residual functional capacity to perform light work, with limited seizure precautions. AR 18. The ALJ found that with limited "safety seizure precaution," Bernard can perform simple, routine, and unskilled tasks and that she has the residual functional capacity to perform light work. AR 18. The ALJ found that the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." *Id*. But, the ALJ found "the claimant's allegations as a whole partially credible" and found that "the record [did] not support the claimant's allegations of work-preclusive limitations from the claimant's seizure disorder and associated symptoms." *Id*.

The ALJ reasoned that although medical evidence raises questions with regard to the etiology of Bernard's seizures, "in addition to the claimant's allegations, the allegations of her significant other, and opinions by her primary care provider, the record must contain signs and laboratory findings that support the claimant's allegations of disabling seizure-like episodes, regardless of their cause." *Id*. The ALJ relied on the lack of positive diagnostic tests and clinical findings to conclude that the claimant's allegations as to the work-limiting effect of her seizures are not supported, from either a neurological or psychological standpoint. AR 18.

The ALJ repeated the evidence showing that plaintiff's seizures were not neurological. AR 19. The ALJ noted that other than self-reporting, the record contained evidence of seizure-activity on only five occasions, and that plaintiff had not sought emergency room or other unscheduled treatment since February of 2011. *Id*.

The ALJ acknowledged the plaintiff argued her seizure condition is psychological, not neurological, and further acknowledged that the medical evidence supported that contention. AR 19-20. But, the ALJ concluded that the record did not contain "persuasive evidence of disabling symptoms from a mental standpoint to substantiate the claimant's allegations of disabling seizure-like activity." AR 20. The ALJ relied on plaintiff's failure to take or be prescribed psychotropic medications, her repeated denial of depressive symptoms, and the pleasant attitude and fully oriented mood and affect she often had with her treating physicians and examiners during the 2011 timeframe. *Id*. The ALJ noted that the record contained no indication of psychological symptoms between April 2011 and November 2012, when plaintiff was put on Prozac and then switched to Wellbutrin in 2013 with good results. *Id*. The ALJ commented on plaintiff's failure to establish psychiatric treatment, other than treatment from her primary care physician. *Id*.

Other factors that led the ALJ to conclude that Bernard's allegations of disabling conditions were not supported in the record included plaintiff's admission that she continued to drive until 2012, the extreme claims of functional limitations that were not supported by the medical record, and no evidence of cognitive limitations (despite plaintiff's hearing testimony that she was unable to help her daughter with first-grade homework). AR 22. The ALJ also relied on inconsistent statements by Bernard regarding her compliance with her medications and the extent

7

and duration of her seizures. *Id*.

The ALJ concluded that while claimant's allegations of having seizure-like activity were credible, that concern was addressed by the "seizure safety precautions" imposed in the RFC. The allegations of concentration problems were also found credible, but addressed by the limitation in the RFC to simple, routine and unskilled tasks. AR 22. The ALJ gave partial weight to Townsend's testimony for the same reasons as he discounted plaintiff's testimony. AR 23. Finally, the ALJ accepted some of Dr. Kohatsu's opinions as to Bernard's work limitations, but discounted Dr. Kohatsu's opinion that Bernard would accumulate more than four absences a year per-month, because of the unremarkable neurological findings and negative results from objective testing, Dr. Kohatsu's failure to rely on anything else other than plaintiff's self-reported symptoms, and Dr. Kohatsu's failure to prescribe psychotropic medications. AR 23, 24.

The ALJ then concluded that Bernard was capable of past relevant work as a telephone quotations clerk. AR 24.

## LEGAL STANDARD

### I. DISABILITY DETERMINATION

A claimant is "disabled" if: (i) "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (ii) the impairment is "of such severity the he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 1382c(a)(3)(A)-(B). An ALJ engages in a five-step sequential analysis to determine whether a claimant is disabled. *See* 20 C.F.R §§ 404.1520(a) and 416.920(a).

In the first step, the ALJ determines whether the claimant is engaged in substantial gainful activity ("SGA").[2] 20 C.F.R. §§ 404.1520(a)(4)(i) and 416.920(a)(4)(i). If the claimant is not

---

[2] Substantial activity is defined as work requiring significant physical or mental activity. 20 C.F.R. §§ 404.1572(a) and 416.972(a). Gainful activity is "work usually done for pay or profit," regardless of whether the claimant is actually compensated. 20 C.F.R. §§ 404.1572(b) and 416.972(b).

8

engaging in SGA, the ALJ determines in step two whether the claimant suffers from a severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii) and 416.920(a)(4)(ii). In step three, the ALJ determines whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in the administrative regulations. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 C.F.R. Part 404, Subpart P, App. 1; *see also* 20 C.F.R. §§ 404.1525 and 416.925. If the claimant satisfies the criteria of a listed impairment, he is disabled; if not, the ALJ proceeds to the next step.

Before step four, the ALJ determines the claimant's Residual Functional Capacity ("RFC"), which is his ability to perform physical and mental work activities on a sustained basis despite the limiting effects of his impairments. 20 C.F.R. §§ 404.1520(e) and 416.920(e). In making this finding, the ALJ considers all the evidence in the record including the claimant's severe and non-severe impairments. 20 C.F.R. §§ 404.1520(e), 404.1545; 416.920(e), and 416.945. At step four, the ALJ determines whether the claimant has the RFC to perform the requirements of his "past relevant work."[3] 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv). If the claimant cannot perform his past work, the ALJ determines in step five whether the claimant can perform any other work existing in the national economy considering his RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v) and 416.920(a)(4)(v). If the claimant is able to do other work, he is not disabled.

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and are free of legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1996). Substantial evidence means "more than a mere scintilla, but less than a preponderance." *Saelee v. Chater*, 94 F.3d 520, 521-22 (9th Cir. 1996) (internal quotation marks omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to

---

[3] "Past relevant work" means substantial gainful activity performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years or fifteen years prior to the alleged disability onset date. 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965.

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).

The Court must review the record as a whole and consider adverse as well as supporting evidence. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins*, 466 F.3d at 882 (quotation marks omitted); *see also Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

**DISCUSSION**

Bernard claims that the ALJ made a number of errors including: (i) erroneously weighing the evidence regarding the duration and required recovery period for Bernard' seizures, (ii) erroneously rejecting the work limitations suggested by Bernard's treating physician, and (iii) failing to adequately support the conclusion that Bernard's seizures could be accommodated by "seizure precautions" at work.

The ALJ issued a thorough decision. However, there is one significant error that pervades a number of her determinations: while the ALJ determined that Bernard suffered from a severe seizure-like disorder, she never explained what impact those seizures had on Bernard's RCF and ability to work. Nor did she point to substantial evidence showing how, despite having a severe seizure-like disorder, Bernard retained the capacity for light work.

As discussed above, the testimony from Bernard was that she was having seizures one to three times a week. That assertion is supported by testimony of her significant other Townsend and by her treating physician (although Dr. Kohatsu likely based her conclusion on Bernard's self-reporting). The ALJ did not dispute the *frequency* of Bernard's seizures or make any finding that they were less frequent.[4]

---

[4] The ALJ did point out that there were contradictions in the record regarding the duration of the seizures – differing from the June 2011 videos showing seizures lasting from 30 – 60 seconds to plaintiff's testimony in July 2013 that the seizures lasted a minimum of three minutes. AR 22.

10

Bernard and Townsend also testified that following her seizures, Bernard would require at least a few hours to recover and that she may not fully recover until 24 hours later. Dr. Kohatsu found similar post-seizure limitations in her 2012 Medical Source Statement although those were, again, likely based on Bernard's subjective testimony. AR 465-466. The ALJ, however, did not address what, if any, post-seizure recovery Bernard would need.

Instead, the only "seizure accommodations" the ALJ discussed, were "safety" accommodations incorporated into the RFC, including a limitation to light work with no climbing, restricted driving, no working at unprotected heights, or working with heavy or hazardous machinery. AR 22. The ALJ purported to address the cognitive impacts from Bernard's seizures (the grogginess and disorientation following them), by limiting Bernard to performing only simply, routine and unskilled tasks. AR 22.

While the ALJ could rely on discrepancies in the record to support her determination that Bernard's seizures were not as severe as Bernard claimed and Dr. Kohatsu apparently believed,[5] after rejecting the work limitations suggested by plaintiff and Dr. Kohatsu the ALJ needed to identify some *other evidence* in the record to support of her RCF determination and ultimate conclusion that Bernard retained the capacity for light work despite having an acknowledged severe seizure-like disorder.[6]

The ALJs failure to dispute the frequency of the seizures and address the consistent testimony of Bernard, Townsend, and Dr. Kohatsu about Bernard's recovery time from her seizures undermines the ALJ's conclusions as to RFC and work capacity. Moreover, without an

---

[5] These discrepancies include that Bernard continued to drive until 2012, did not always take her medicines when the thinking was that the seizures were epileptic/electrical, sought no emergency or unscheduled treatments after early 2011 for her seizures, and did not avail herself of psychiatric treatment with Dr. Kozart when it was offered.

[6] In Opposition, the Commissioner points to Dr. Kohatsu's objective medical testing – finding that Bernard's neurological functioning examinations, imaging, and Dr. Kohatsu's own observations on Bernard's gait, balance, range of motion, strength, and sensation were mostly normal – as providing adequate substantial evidence for the ALJ's conclusion that despite her seizures, Bernard retained the capacity for light work. Defendant's Motion for Summary Judgment (Dkt. No. 23), 4, 6, 7, 10. But Dr. Kohatsu's opinion, and Bernard's testimony, is that that Bernard experiences fatigue and requires rest *following a seizure*. There is no evidence that Bernard seized before any of the examinations during which Dr. Kohatsu made the observations that defendant relies on. Bernard argues only that she experiences fatigue and cognitive disorientation for a number of hours *following a seizure*.

11

explanation of how the ALJ reached her determination that despite the severe seizure-like disorder Bernard retained the capacity for light work, my ability to review the ALJ's determination is impeded.  *See, e.g., Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) ("[W]e still demand that the agency set forth the reasoning behind its decisions in a way that allows for meaningful review.  A clear statement of the agency's reasoning is necessary because we can affirm the agency's decision to deny benefits only on the grounds invoked by the agency.").[7]  Remand is necessary.

## CONCLUSION

For the reasons above, plaintiff's motion for summary judgment is GRANTED and defendant's motion for summary judgment is DENIED.  This case is REMANDED for further proceedings consistent with this Order.

**IT IS SO ORDERED**.

Dated: March 8, 2016



WILLIAM H. ORRICK
United States District Judge

---

[7] On remand, the ALJ may be able to fill the gaps by securing additional testimony, pressing Bernard for more information on these topics, or by requiring consultative exams.